PRIMERICA LIFE INSURANCE COMPANY, PLAINTIFF v. JAMES MASSENGILL & SONS CONSTRUCTION COMPANY, TONY W. MASSENGILL, AND JIMMY N. MASSENGILL, SR., DEFENDANTS

No. COA10-996

(Filed 19 April 2011)

**Unjust Enrichment— insurance proceeds—JNOV properly granted**

The trial court did not err in granting plaintiff's motion for JNOV on plaintiff's claim against defendant James Massengill & Sons Construction Company (JMS) for unjust enrichment. All the elements of plaintiff's unjust enrichment claim were met as a matter of law and JMS failed to prove an irrevocable and material change of position such that it would be unjust to require JMS to refund the proceeds. Furthermore, because JMS could not show any real injury or damages, the issue of balancing the relative equities was not for the jury to consider.

Appeal by defendants from judgment entered 19 November 2009 by Judge Henry V. Barnette, Jr., in Wake County Superior Court. Heard in the Court of Appeals 7 March 2011.

*Parker Poe Adams & Bernstein LLP, by Cynthia L. Wittmer, Scott E. Bayzle, and James Lynn Werner, for plaintiff-appellee.*

*Michael W. Strickland & Associates, P.A., by Michael W. Strickland, for defendant-appellants.*

McCULLOUGH, Judge.

Defendant James Massengill & Sons Construction Company ("JMS") appeals from an order granting plaintiff Primerica Life Insurance Company's ("Primerica") motion for judgment notwithstanding the verdict and entering partial judgment in favor of Primerica and against defendant JMS. After careful review, we affirm.

## I. Background

JMS is a construction company owned and operated, at all relevant times, by three brothers: John David Massengill ("John"), Tony W. Massengill ("Tony"), and Jimmy N. Massengill, Sr. ("Jimmy"). Tony served as President of the company, John served as the company's Vice President, and Jimmy served as the company's Secretary.

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

On 1 January 1992, Primerica issued a "key man" life insurance policy to JMS, insuring the lives of John and Tony in the face amount of one million dollars ($1,000,000) each ("the Original Policy"). Under the Original Policy, Tony was the primary insured, while John was covered through an "Other Insured Rider." JMS was designated as the owner of the Original Policy, paid the premiums for the coverage under the Original Policy, and was initially designated as the primary beneficiary of the coverage on both Tony and John.

During the months of October through December of 1995, JMS made a series of changes to the Original Policy, by which the beneficiaries of both Tony and John's coverage were changed from JMS to the respective spouses and children of Tony and John. Each change was made in writing by letter on the letterhead of JMS and signed by both Tony and John. On 5 June 2000, JMS made another change to the Original Policy, changing the beneficiary of John's coverage to his estate. This change was also made by letter on the letterhead of JMS and signed by both Tony and John on behalf of JMS.

In late 2001, the Original Policy was approaching the end of its initial ten-year level coverage term and came up for renewal. By its terms, the Original Policy was set to automatically renew at the end of its ten-year term, unless a change was made to the Original Policy by JMS, the policy owner. On 23 October 2001, Primerica notified JMS by letter of the approaching renewal date and informed JMS that higher premium payments would accompany the renewal unless JMS wanted to renew its coverage under newly available insurance products offering lower premiums. In addition, the local Primerica agent, Douglas A. Vinson ("Vinson"), went to the offices of JMS to discuss the renewal options and to obtain the necessary signatures on the renewal paperwork. John was not in the office at that time, but Vinson consulted with Tony regarding the renewal options and the new insurance products offering lower premiums. Tony informed Vinson that both he and John wanted to continue their coverage with no changes. After the meeting, Tony signed a policy change form, bearing the same policy number as the Original Policy, to renew the same life insurance coverage but using the new lower-cost product. John was not present during any part of the meeting, and Vinson never saw John or obtained John's signature. Vinson forwarded the renewal documents to Douglas Harold Stumbo ("Stumbo"), a National Sales Director for Primerica, who in turn submitted the forms for processing. However, upon receipt of the policy change form, Primerica's underwriting department notified Stumbo that cov-

254            IN THE COURT OF APPEALS

PRIMERICA LIFE, INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

erage for John could no longer be issued as a rider to Tony's coverage under the lower-cost option requested on the policy change form, and recommended that John's coverage be moved to a separate policy number. As a result, Stumbo altered the policy change form to request deletion of John's rider from the renewed policy and completed an application to convert the rider to coverage under a separate policy number for John. In doing so, Stumbo mistakenly made two changes to the coverage which were unknown to and unauthorized by JMS. Stumbo listed JMS, rather than John's estate, as the beneficiary on the application for conversion of John's rider. Because the prior changes in beneficiary designation were handled by Primerica's home office without the involvement of local agents, Stumbo was unaware that JMS had changed the beneficiary of John's coverage to John's estate. Stumbo also assumed, based on the Original Policy application and the fact that the Original Policy was set up as a "key man" policy, that JMS was the proper beneficiary. Also, Stumbo indicated that John, rather than JMS, was the owner of the converted coverage. Stumbo submitted the conversion application to Primerica in early 2002, without double-checking the beneficiary and ownership designations with JMS or John or Primerica's home office, and signing John's name himself in an attempt to expedite the renewal process.

On 19 February 2002, Primerica issued coverage on John's life under a separate policy number for one million dollars ($1,000,000) with JMS designated as the beneficiary of the coverage and John designated as the owner of the new policy ("the Rider Conversion Policy"). Following its issuance, the Rider Conversion Policy was sent to JMS by certified mail on 21 June 2002.

John died on 29 March 2005 after battling cancer since 2001. In a letter dated 10 May 2005, JMS notified Primerica of John's death and requested that Primerica cease drafting the monthly premiums from JMS's bank account. In response, Primerica sent a claimant's form to JMS, the beneficiary designated by Stumbo on the Rider Conversion Policy. JMS completed the claimant's form and sent the form to Primerica, asserting that JMS was the rightful beneficiary of John's coverage.

On 10 June 2005, Primerica sent a benefit check payable to JMS in the amount of $1,000,797.06, representing the face amount of John's coverage, plus a two-month premium refund. JMS immediately deposited the check into its bank account. The company had been struggling financially during the years leading up to John's death and had many outstanding debts at the time it deposited the insur-

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

ance proceeds received from Primerica. On 5 July 2005, fifteen days after depositing the check in its bank account, JMS had spent nearly $900,000 out of the account. Within two months of receipt of the insurance proceeds, the entire amount had been spent. JMS used the entirety of the proceeds to pay outstanding company debts and employee salaries so that the business could continue.

Judy Massengill ("Judy"), John's widow and executrix of his estate ("the Estate"), was unaware of JMS's actions regarding the insurance proceeds for John's coverage. Accordingly, having been provided Primerica's contact information by JMS, on 16 June 2005 Judy sent a letter to Primerica requesting documentation to submit a claim for the insurance proceeds for John's coverage on behalf of the Estate. Primerica responded by letter on 27 June 2005, stating that the Estate was not the designated beneficiary under the Rider Conversion Policy and that a benefit check for the proceeds had been paid to the designated beneficiary. JMS did not inform Judy that it had received the insurance proceeds for John's coverage.

Thereafter, Judy obtained copies of the insurance documents from Primerica and, after inspecting the documents, suspected that the documents were incorrect and unauthorized. As a result, on 7 December 2006, Judy filed an action on behalf of the Estate against Primerica to recover the one million dollars ($1,000,000) of insurance coverage on John's life. The Estate claimed that Primerica had erroneously paid the one million dollars in proceeds to JMS. During the pendency of the action by the Estate, Primerica discovered the mistaken changes made by Stumbo during the renewal process and determined that the Estate was in fact the correct beneficiary. Subsequently, Primerica paid the one million dollars in proceeds, for the second time, to the Estate and settled all of the Estate's claims against Primerica. As a result, on 12 October 2007, the Estate dismissed its action against Primerica.

On 21 February 2007, before the original action by the Estate against Primerica was dismissed, Primerica filed a third-party complaint against JMS, Tony, and Jimmy, asserting a claim of unjust enrichment to recover the one million dollars in proceeds mistakenly paid to JMS for John's coverage. In response, JMS, Tony, and Jimmy filed an Answer and certain counterclaims, all of which formed the basis of the present action. However, Tony and Jimmy individually dismissed all of their counterclaims prior to proceeding to trial.

The trial of the present action commenced on 14 September 2009. At the close of Primerica's case-in-chief, JMS dismissed all of its

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

remaining counterclaims. At the close of all the evidence, Primerica moved for a directed verdict, which was denied by the trial court. On 17 September 2009, seven issues were submitted to the jury on Primerica's claim for unjust enrichment. The first issue concerned Primerica's claim against JMS and was as follows:

> Was the Defendant [JMS] unjustly enriched by receiving death benefits from a life insurance policy on the life of John D. Massengill, issued by the Plaintiff [Primerica] in the amount of $1,000,000.00?

The remaining six issues submitted to the jury, applicable only in the event the first issue was answered in the affirmative, concerned the imposition of individual liability upon Tony and Jimmy. The jury answered the first issue in the negative, and therefore, did not consider the remaining six issues regarding Tony and Jimmy's individual liability.

On 2 October 2009, Primerica filed a motion for judgment notwithstanding the verdict ("JNOV") pursuant to Rule 50(b) of the North Carolina Rules of Civil Procedure and/or for a new trial. Primerica's motion requested JNOV in its favor and against JMS on the first issue of JMS's liability for unjust enrichment and a new trial on the remaining six issues. This post-trial motion was heard by the trial court on 26 October 2009. Following the hearing, the trial court issued an order on 19 November 2009 granting JNOV in favor of Primerica and against JMS. In doing so, the trial court found that JMS's own admissions and testimony, the unchallenged documentary evidence introduced at trial, and other undisputed evidence, all viewed in the light most favorable to JMS, could support no other finding or conclusion but that JMS was unjustly enriched by the receipt of the one million dollars in insurance proceeds to which it was not entitled. From this order, JMS appeals.

## II. Judgment notwithstanding the verdict

JMS first argues that the trial court erred in granting Primerica's motion for JNOV. Pursuant to Rule 50 of the North Carolina Rules of Civil Procedure, when a party's motion for directed verdict at the close of the evidence is denied, that party "may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict[.]" N.C. Gen. Stat. § 1A-1, Rule 50(b)(1) (2009). A motion for JNOV provides the trial court with an opportunity to reconsider the question of the sufficiency of the evidence after the jury has returned a verdict and

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

permits the court to enter judgment "in accordance with the movant's earlier motion for a directed verdict and notwithstanding the contrary verdict actually returned by the jury." *Ace, Inc. v. Maynard*, 108 N.C. App. 241, 245, 423 S.E.2d 504, 507 (1992) (internal quotation marks and citation omitted).

The propriety of granting JNOV is determined by the same considerations as that of the movant's prior motion for directed verdict— whether the evidence, taken in the light most favorable to the non-movant, is insufficient, as a matter of law, to support a verdict for the non-moving party. *N.C. Nat'l Bank v. Burnette*, 297 N.C. 524, 536, 256 S.E.2d 388, 395 (1979); *see also Smith v. Price*, 315 N.C. 523, 527, 340 S.E.2d 408, 411 (1986) ("The same standard is to be applied by the courts in ruling on a motion for JNOV as is applied in ruling on a motion for a directed verdict."). Thus, both a motion for directed verdict and a motion for JNOV ask "whether the evidence is sufficient 'to take the case to the jury.'" *Sweatt v. Wong*, 145 N.C. App. 33, 41, 549 S.E.2d 222, 227 (2001) (quoting *Abels v. Renfro Corp.*, 335 N.C. 209, 214, 436 S.E.2d 822, 825 (1993)). "When a judge decides that a directed verdict [or JNOV] is appropriate, actually he is deciding that the question has become one exclusively of law and that the jury has no function to serve." *Hodgson Constr., Inc. v. Howard*, 187 N.C. App. 408, 411, 654 S.E.2d 7, 10 (2007) (alteration in original) (internal quotation marks and citation omitted).

Although Rule 50 "contemplates that *any* party may move for a directed verdict at the close of all the evidence," such verdicts in favor of the party with the burden of proof "are rarely granted." *Burnette*, 297 N.C. at 536, 256 S.E.2d at 395. "This is so because, even though proponent succeeds in the difficult task of establishing a clear and uncontradicted prima facie case, there will ordinarily remain in issue the credibility of the evidence adduced by proponent." *Id.* Accordingly, a trial court must not direct a verdict in favor of the party with the burden of proof when the party's right to recover "depends upon the credibility of his [own] witnesses." *Cutts v. Casey*, 278 N.C. 390, 417, 180 S.E.2d 297, 311 (1971); *see also Murray v. Murray*, 296 N.C. 405, 409, 250 S.E.2d 276, 277-78 (1979). However, "a directed verdict or a judgment notwithstanding the verdict may be entered in favor of the party with the burden of proof 'where credibility is manifest as a matter of law.'" *Price*, 315 N.C. at 527, 340 S.E.2d at 411 (quoting *Burnette*, 297 N.C. at 536, 256 S.E.2d at 395).

Our Supreme Court has recognized three situations where "the credibility of movant's evidence is manifest as a matter of law":

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

(1) Where non-movant establishes proponent's case by admitting the truth of the basic facts upon which the claim of proponent rests.

(2) Where the controlling evidence is documentary and non-movant does not deny the authenticity or correctness of the documents.

(3) Where there are only latent doubts as to the credibility of oral testimony and the opposing party has failed to point to specific areas of impeachment and contradictions.

*Burnette*, 297 N.C. at 537-38, 256 S.E.2d at 396 (internal quotation marks and citations omitted). "In such situations it is proper to direct verdict for the party with the burden of proof if the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn." *Id.* at 536, 256 S.E.2d at 395; *see also Murdock v. Ratliff*, 310 N.C. 652, 659, 314 S.E.2d 518, 522 (1984) ("[I]n order to justify granting a motion for a directed verdict in favor of the party with the burden of proof, the evidence must so clearly establish the fact in issue that no reasonable inferences to the contrary can be drawn.").

This Court's review of the trial court's grant or denial of JNOV is *de novo. Hodgson Constr.*, 187 N.C. App. at 412, 654 S.E.2d at 11. This Court considers the matter anew and freely substitutes its own judgment for that of the trial court. *Id.*

In the present case, Primerica asserts a claim for unjust enrichment against JMS to recover the one million dollars in insurance proceeds that Primerica mistakenly paid to JMS pursuant to the terms of the Rider Conversion Policy. JMS contends the trial court erred in granting Primerica's motion for JNOV on Primerica's claim against JMS for unjust enrichment because Primerica failed to prove that JMS was not entitled to the insurance proceeds pursuant to the terms of the Rider Conversion Policy and because the credibility and inequitable conduct of Primerica's agents in procuring the Rider Conversion Policy were issues to be considered and determined by the jury. Alternatively, JMS contends that where a valid express contract exists, unjust enrichment is unavailable. JMS argues that Primerica is precluded from asserting its claim of unjust enrichment because the Rider Conversion Policy is valid on its face and was delivered and accepted by JMS and John. We find JMS's arguments are without merit under the circumstances presented in the present case.

**PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.**

[211 N.C. App. 252 (2011)]

Our Courts have found that "[t]he issue of who stands for the loss and disappointment when money has been disbursed under some mistaken belief of entitlement is always problematic." *First Nat'l City Bank v. McManus*, 29 N.C. App. 65, 70, 223 S.E.2d 554, 557 (1976). However, our Supreme Court has held that, under some circumstances, an insurer is entitled to recover proceeds paid by it under a mistaken belief that the terms of the insurance contract required such payment. *U.S. Fidelity & Guaranty Co. v. Reagan*, 256 N.C. 1, 9, 122 S.E.2d 774, 780 (1961). "Generally, when money is paid to another under the influence of a mistake of fact, and it would not have been paid had the person making the payment known that the fact was otherwise, the money may be recovered." *Tarlton v. Keith*, 250 N.C. 298, 306, 108 S.E.2d 621, 626 (1959). An action for such recovery is permitted "on the theory that by such payment the recipient has been unjustly enriched at the expense of the party making the payment and is liable for money had and received." *Reagan*, 256 N.C. at 9, 122 S.E.2d at 780 (internal quotation marks and citation omitted); *see also N.C. Farm Bureau Mut. Ins. Co. v. Greer*, 54 N.C. App. 170, 172, 282 S.E.2d 553, 555 (1981).

"An action for money had and received may be maintained as a general rule whenever the defendant has money in his hands which belongs to the plaintiff, and which in equity and good conscience he ought to pay to the plaintiff." *Allgood v. Wilmington Sav. & Trust Co.*, 242 N.C. 506, 512, 88 S.E.2d 825, 829 (1955) (internal quotation marks and citation omitted).

> Recovery is allowed upon the equitable principle that a person should not be permitted to enrich himself unjustly at the expense of another. Therefore, the crucial question in an action of this kind is, to which party does the money, in equity and good conscience, belong? . . . The test is not whether the defendant acquired the money honestly and in good faith, but rather, has he the right to retain it.

*Id.*

An action for money had and received, therefore, allows a plaintiff to maintain an equitable action to recover a payment mistakenly made to the defendant "on the theory that by such payment the recipient has been unjustly enriched at the expense of the party making the payment." *Johnson v. Hooks*, 21 N.C. App. 585, 590, 205 S.E.2d 796, 800 (1974). Under a claim for unjust enrichment, a plaintiff must establish certain essential elements: (1) a measurable benefit was

260 IN THE COURT OF APPEALS

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously. *Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 184 N.C. App. 688, 695-96, 647 S.E.2d 111, 116 (2007). In addition, "a payment induced by mistake cannot be recovered if the payee, in equity and good conscience, is entitled to retain the money received." *Tarlton*, 250 N.C. at 306, 108 S.E.2d at 626.

In the present case, the first element—that Primerica conferred a measurable benefit on JMS—is undisputed by the parties and is therefore not at issue. At trial, Tony admitted that he and Jimmy submitted a claimant's form to Primerica on behalf of JMS for the payment of the insurance proceeds for John's coverage, that JMS in fact received a benefit check from Primerica in the amount of $1,000,797.06, and that JMS deposited the check into its bank account. These admissions are further supported by the unchallenged documentary evidence, including a copy of Primerica's check to JMS in the amount of $1,000,797.06 and a copy of JMS's bank deposit slip. Thus, the fact that a measurable benefit in the form of insurance proceeds in the amount of one million dollars was conferred on JMS on 10 June 2005 is uncontroverted.

Similarly, the parties do not dispute the second and third elements of Primerica's unjust enrichment claim. JMS consciously accepted the benefit of the one million dollars in insurance proceeds by voluntarily submitting the claimant's form to Primerica, accepting and depositing the benefits check, and expending the money. The same admissions and uncontroverted documentary evidence likewise establish this fact. Nor is there any argument that the insurance proceeds were conferred by Primerica as a gift to JMS or to officiously intermeddle in the affairs of JMS. Thus, the second and third elements of Primerica's unjust enrichment claim are not at issue.

However, whether JMS was entitled to receive the benefit check and/or retain the insurance proceeds is the determinative issue in the present case. On this point, JMS argues that John's intent in selecting a beneficiary is material to the issue of entitlement and that the evidence introduced at trial established an issue of fact for the jury as to the true intended beneficiary of John's insurance coverage. JMS further contends that the credibility of Primerica's agents Vinson and Stumbo bears on the issue of John's intent in selecting a beneficiary, and therefore because the credibility of Primerica's own witnesses bears on the issue of entitlement of JMS to the proceeds, the question

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

was for the jury to determine and was not the proper subject of a motion for JNOV. We find JMS's contentions to be misplaced.

"We first note the well-settled principle that an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto. It follows from this rule that those persons entitled to the proceeds of a life insurance policy must be determined in accordance with the contract." *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986) (citations omitted). JMS correctly notes the rule that, "[i]n making such a determination, the intention of the parties controls any interpretation or construction of the contract, and intention must be derived from the language employed." *Id.* However, JMS's application of that rule to the circumstances of the present case is misguided.

The terms of the Original Policy create a clear distinction between the policy owner and the person whose life is to be insured. The "definitions" section of the Original Policy defines "the Insured" as the "person whose life is insured under the Policy," and the owner of the policy is defined as "the Insured unless otherwise provided in the application[.]" Notably, in the Original Policy application, "James Massengill & Sons" is designated as the Policy Owner, while Tony W. Massengill is designated as the Insured and John D. Massengill is designated as the "Other Insured" for purposes of coverage under the "Other Insured Rider."

In addition, the Policy contains these pertinent general provisions:

*OWNER OF POLICY*—This Policy belongs to you, the owner. During the lifetime of the Insured, you have all of the rights described in this Policy.

*CHANGE OF BENEFICIARY*—A change of Beneficiary may only be made by Notice to [Primerica]. Such Notice to [Primerica] must be signed by you [the owner] while the Insured is alive.

*CHANGE OF BENEFICIARY*—A change of Beneficiary for this Rider may only be made by filing a Notice to [Primerica]. Such Notice must be signed by you [the owner] while the Other Insured Person is alive.

(Emphasis added.) As our Supreme Court has stated:

The distinction [between the policy owner and the insured] is a crucial one, for the owner of an insurance policy acquires the authority to exercise any rights or privileges granted therein . . . .

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

The power to change beneficiaries falls squarely into the category of rights and privileges under the contract. Consequently, it must be recognized that the owner is the only person who can exercise this power, even though the owner is not the insured.

*Dortch*, 318 N.C. at 381-82, 348 S.E.2d at 797. This Court has also held "only the owner of a life insurance policy may change the beneficiary." *Adams v. Jefferson-Pilot Life Ins. Co.*, 148 N.C. App. 356, 361, 558 S.E.2d 504, 508 (2002). Thus, any changes made to an insurance policy affecting the beneficiary designation or the ownership of the policy must be made by the policy owner. If not, the changes are a legal nullity and of no force and effect, being that the changes were never validly assented to by the proper party. *See Dortch*, 318 N.C. at 381-82, 348 S.E.2d at 797 (holding an attempted change in beneficiary to an insurance policy by the insured was a nullity and ineffectual because only the policy owner can effectively make such changes). The express terms of the Original Policy itself make these rules explicit. Thus, only JMS, as the owner of the Original Policy, was authorized to make any changes, especially those affecting the beneficiary designation or the ownership, to the Original Policy.

In the present case, the unchallenged documentary evidence and the admissions of JMS show that JMS's June 2000 designation of John's estate as the beneficiary of his coverage—a change made in writing on JMS letterhead and signed by both Tony and John on behalf of JMS—was the last beneficiary change made or approved by JMS with regard to John's coverage. The designation of JMS as beneficiary of John's coverage in connection with the 2002 renewal of the Original Policy and conversion of John's rider was purely the result of acts by Primerica's agent Stumbo and was neither approved nor authorized nor requested by JMS. At trial, Tony, acting President of JMS, stated that the June 2000 designation of John's estate was the last known beneficiary designation authorized by JMS under John's coverage and that he was unaware of any changes to that designation made or authorized by JMS at any time thereafter. Tony also admitted at trial that upon signing the policy change form in 2001 after his consultation with Vinson, his understanding was that the Original Policy, owned by JMS, was simply being renewed under a lower-cost product and that no other changes were authorized beyond the renewal of the existing insurance coverage.

Further, in its answer and counterclaim in the present case, JMS stated:

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

Massengill & Sons, the owner of the policy covering the lives of Tony and John Massengill, never executed a document deleting the coverage for John Massengill, nor did it execute a new application to insure the life of John Massengill.

" 'A party is bound by his pleadings and, unless withdrawn, amended or otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader.' " *Bratton v. Oliver*, 141 N.C. App. 121, 125, 539 S.E.2d 40, 43 (2000) (quoting *Davis v. Rigsby*, 261 N.C. 684, 686, 136 S.E.2d 33, 34 (1964)). "The effect of a judicial admission is to establish the fact for the purposes of the case and to eliminate it entirely from the issues to be tried." *Rollins v. Miller Roofing Co.*, 55 N.C. App. 158, 162, 284 S.E.2d 697, 700 (1981). The above statement made by JMS in its Answer and Counterclaim was contained in JMS's recitation of factual allegations and was not altered or dismissed in its entirety before proceeding to trial, thereby rendering the statement conclusive evidence that the Rider Conversion Policy was never requested, authorized, or assented to by JMS.

Therefore, JMS's own admissions established that JMS had not authorized the changes made to the beneficiary and ownership designations during the renewal process of the original Policy. As such, the Rider Conversion Policy was void *ab initio* and is a legal nullity. "A void contract is no contract at all; it binds no one and is a mere nullity." *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 270, 162 S.E.2d 507, 511 (1968) (internal quotation marks and citation omitted). Consequently, the resulting void Rider Conversion Policy is without legal effect and confers no rights or obligations upon the parties to the void agreement.

In addition, John's rider under the Original Policy contained the following pertinent provision:

> AUTOMATIC RENEWAL PROVISION—If this Rider is continued in force to the end of the Term Period, it will be automatically renewed under the terms of this provision unless [Primerica] receive[s] written notice of cancellation. The renewal shall be for an additional ten year Term Period . . . . Evidence of insurability will not be required for renewal, only payment of the applicable premiums for the rates then in effect.

Because the Rider Conversion Policy was void *ab initio* and because JMS continued to pay the premium amounts requested, the Original Policy, including John's rider, would have automatically renewed under the automatic renewal provision, with the existing beneficiary

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

designations at the time of renewal remaining unchanged. As Tony testified at trial, this was in accordance with his and John's wishes at the time of the renewal. Hence, the last beneficiary designation of John's estate made by JMS to the Original Policy for John's coverage remained controlling.

Accordingly, John's intent in selecting a beneficiary under the circumstances of this case is totally irrelevant to the issue of entitlement. John was not the owner of the Original Policy, and therefore he had no right under either the express terms of the Original Policy or the law in North Carolina to unilaterally change the beneficiary designation. Furthermore, because JMS's own admissions established that JMS had neither authorized the changes made to the beneficiary and ownership designations under the Rider Conversion Policy nor requested the termination and conversion of John's rider to a separate policy, the credibility of Primerica's witnesses is inapposite to the issue of entitlement. JMS's own admissions unequivocally established that the Rider Conversion Policy, the only contract under which JMS can maintain a claim of entitlement to the proceeds, was void as a matter of law, and no reasonable inference to the contrary can be drawn. Because the Rider Conversion Policy was void *ab initio*, its existence likewise does not preclude Primerica from asserting its claim of unjust enrichment. Therefore, the trial court properly concluded that all the elements of Primerica's unjust enrichment claim were met as a matter of law.

Nevertheless, because an action for unjust enrichment is an equitable claim, our Supreme Court has limited recovery of such mistaken payments to only those situations where "the payment has not caused such a change in the position of the payee that it would be unjust to require a refund." *Reagan*, 256 N.C. at 9, 122 S.E.2d at 780.

> Though the issue is never simple or easily explained, we are of the opinion that [a] change of position is not detrimental, and is not a defense, if the change can be reversed, or the status quo can be restored, without expense. The burden of such an irrevocable and material change of position that the payee cannot be placed in status quo is on the payee.

*McManus*, 29 N.C. App. at 71, 223 S.E.2d at 558 (internal quotation marks and citation omitted) (alteration in original). In addition, "[a]s a general rule, it is no defense to an action for the recovery of a payment made under mistake of fact that the money or property has been paid over to another or spent by the payee." *Reagan*, 256 N.C. at

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

10, 122 S.E.2d at 781 (internal quotation marks and citation omitted). Further, "plaintiff's negligence, if any, and defendant's ostensible good faith, standing alone, constitute an insufficient defense to plaintiff's claim for repayment." *McManus*, 29 N.C. App. at 70, 223 S.E.2d at 558.

In the present case, Primerica paid the insurance proceeds for John's coverage to JMS under the mistaken belief that the terms of the Rider Conversion Policy were both valid and accurate and that JMS was thereby the proper beneficiary. The burden then falls on JMS, the payee of the mistaken proceeds, to prove an irrevocable and material change of position such that it would be unjust to require JMS to refund the proceeds. JMS has failed to carry this burden. JMS claims that it relied on the insurance proceeds to "keep the business going" by paying off outstanding company debts and paying employees so that they could continue working. However, as we have stated, the mere fact that JMS has spent the money or paid the money over to others, even if done in good faith to save its business, is not a defense to Primerica's claim for repayment. *Reagan*, 256 N.C. at 10, 122 S.E.2d at 781; *McManus*, 29 N.C. App. at 70, 223 S.E.2d at 558. Moreover, requiring JMS to refund the money simply places JMS back in the position it was in before receiving the mistaken payment. JMS has failed to demonstrate any injury, much less a material and irrevocable change of position, which it has suffered in reliance on the mistaken payment.

JMS also asserts that the negligent actions of Primerica's agents Vinson and Stumbo in failing to ascertain the proper beneficiary and ownership designations during the renewal and conversion process and in signing John's signature to obtain the Rider Conversion Policy caused the mistake to occur, and therefore, Primerica's inequitable conduct bars it from recovery under an equitable claim such as unjust enrichment. At the very least, JMS asserts that the relative equities of the parties is a question for the jury to determine, and therefore, JNOV is not proper under these circumstances. Essentially, JMS asserts an application of the clean hands doctrine.

It is true that "[w]hether plaintiff committed an unconscionable act and whether her actions were more egregious than those of defendants, are questions of material fact to be decided by a jury and not by the court." *Ferguson v. Ferguson*, 55 N.C. App. 341, 347, 285 S.E.2d 288, 292 (1982). However, in order for the issue of balancing the relative equities to reach the jury, the defendant must have suffered some injury or have been damaged by the inequitable conduct of the

PRIMERICA LIFE INS. CO. v. JAMES MASSENGILL & SONS CONSTR. CO.

[211 N.C. App. 252 (2011)]

plaintiff. *See Ray v. Norris*, 78 N.C. App. 379, 385, 337 S.E.2d 137, 142 (1985) ("The doctrine of clean hands is only available to a party who was injured by the alleged wrongful conduct.").

As stated above, JMS has failed to demonstrate any injury or damages, other than that the money was spent to save its "dying company," resulting from Primerica's mistaken payment of the insurance proceeds. Again, that the proceeds have been spent or paid over to others, even if done in good faith, is insufficient. *Reagan*, 256 N.C. at 10, 122 S.E.2d at 781. Moreover, JMS's counsel unequivocally stated at trial that the only damages suffered by JMS as a result of Primerica's mistaken payment is the expenditure of attorney's fees in defending the present action. Because JMS cannot show any real injury or damages, the issue of balancing the relative equities was not for the jury to consider.

In sum, JMS's own admissions establish that JMS, as owner of the Original Policy, neither authorized the changes made to the beneficiary and ownership designations under the Rider Conversion Policy nor requested the termination and conversion of John's rider to a separate policy. The unchallenged documentary evidence further supports JMS's admissions. We therefore find that credibility is manifest as a matter of law in establishing that the Rider Conversion Policy, the only contract under which JMS can maintain a claim of entitlement to the proceeds, was void as a matter of law, and no reasonable inference to the contrary can be drawn. Therefore, Primerica's payment of the insurance proceeds for John's coverage to JMS under the mistaken belief that the Rider Conversion Policy was valid and that JMS was thereby the proper beneficiary may be recovered. Because JMS was not entitled to the insurance proceeds, it may not, in equity and good conscience, retain those funds. The conduct of Primerica's agents, while unacceptable, has no bearing in the present case, as JMS has failed to show any injury or damages resulting from such inequitable conduct. Thus, the trial judge properly found there were no issues of fact or credibility for the jury to determine, and therefore JNOV in favor of Primerica was proper.

We note that "[a] motion for JNOV . . . 'is cautiously and sparingly granted.' " *Sweatt*, 145 N.C. App. at 41, 549 S.E.2d at 226-27 (quoting *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 368-69, 329 S.E.2d 333, 337-38, *aff'd in part and rev'd in part*, 313 N.C. 362, 329 S.E.2d 333 (1985)). However, when the evidence is legally insufficient " 'to support a verdict for the [prevailing party],' " *Post & Front Properties v. Roanoke Construction Co.*, 117 N.C. App. 93, 96, 449

S.E.2d 765, 767 (1994) (quoting *Douglas v. Doub*, 95 N.C. App. 505, 511, 383 S.E.2d 423, 426 (1989)), and when "the question has become one exclusively of law [such] that the jury has no function to serve," *Howard*, 187 N.C. App. at 411, 654 S.E.2d at 10 (internal quotation marks and citation omitted), a motion for JNOV may be properly granted. Accordingly, the trial judge in the present case properly granted Primerica's motion for JNOV.

Because we find the trial court properly granted Primerica's motion for JNOV, we need not address JMS's remaining arguments that the trial court erred in not directing a verdict in favor of JMS and that the trial court erred in not instructing the jury on the equitable defenses of unclean hands and equitable estoppel.

### III. Conclusion

The uncontroverted evidence presented at trial, including JMS's own admissions and the unchallenged documentary evidence, conclusively establish the elements of Primerica's claim for unjust enrichment. In addition, JMS has failed to show any injury or damages resulting from the conduct of Primerica's agents. As a result, the trial court properly concluded that Primerica was entitled to JNOV, and therefore, the trial court's order granting JNOV in favor of Primerica must be affirmed.

Affirmed.

Chief Judge MARTIN and Judge McGEE concur.